UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| DAVID WETCH,<br><br>                    Plaintiff,<br><br>          vs.<br><br>CRUM & FORSTER COMMERCIAL INS.,  NORTH RIVER INSURANCE COMPANY,  UNITED STATES FIRE INSURANCE COMPANY, and  CRUM & FORSTER HOLDINGS CORP.,<br><br>                    Defendants. | 5:17-CV-05033-JLV<br><br><br>REPORT AND RECOMMENDATION |

**INTRODUCTION**

This matter is before the court on plaintiff David Wetch's amended complaint alleging claims arising out of benefits he alleges defendants owed him under a policy of worker's compensation insurance issued to Mr. Wetch's then-employer, Midcontinent Media, Inc. ("Midcontinent"), for a work-related injury that occurred in July, 1991.  See  Docket No. 44.  Jurisdiction is premised on diverse citizenship between Mr. Wetch and the defendants and an amount in controversy in excess of $75,000.  See 28 U.S.C. § 1332.

Defendants have filed three motions to dismiss:  Docket No. 45 (Crum & Forster Holdings Corp—hereinafter "C & F Holdings"), Docket No. 46 (Crum & Forster Commerical Ins.—hereinafter C & F Commercial Ins."--and North River

Ins. Co.—hereinafter "North River"),[1] and Docket No. 47 (United States Fire Ins. Co.—hereinafter "US Fire").  Each defendant except US Fire argues this court lacks personal jurisdiction over it and moves to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2).

C & F Holdings, C & F Commerical Ins. and North River allege Mr. Wetch has failed to state any claims against them because he has alleged no involvement in any of the actions giving rise to Mr. Wetch's claims.  Docket No. 45.  Finally, all defendants argue Mr. Wetch has failed to state a claim as to any of them in count five of the amended complaint (paragraphs 97-99 & 135-39 of Docket No. 44).

These matters have been referred to this magistrate judge for a recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and the October 16, 2014, standing order of the Honorable Jeffery L. Viken, Chief United States District Judge.  See Docket No. 75.  The following is this court's recommended disposition.

## FACTS

### A.    Mr. Wetch's 1992 Bad Faith Case

The current dispute has ancient roots spanning the entire legal career of this magistrate judge.  Mr. Wetch was injured at work in 1991 and brought a

---

[1] Crum & Forster Commercial Ins. and North River Ins. Co. previously filed a motion to dismiss under Mr. Wetch's original complaint.  See Docket No. 22. That motion was denied without prejudice when Mr. Wetch filed his amended complaint, with the court's assurance that prior briefs and supporting documents submitted as to Docket No. 22 would be considered in connection with Docket No. 46.  See Docket No. 57.

worker's compensation claim against his employer, Midcontinent.  A bad faith action for failure to pay worker's compensation benefits was subsequently brought by Mr. Wetch in South Dakota state court, naming North River and C & F Commerical Ins. as the defendants.  North River and C & F Commercial Ins. removed that action to federal court.  See Wetch v. North River, Civ. No. 92-5123-RHB, Docket No. 1 (hereinafter "1992 Docket #").

In his complaint, Mr. Wetch alleged North River was the provider of worker's compensation insurance to Midcontinent.  1992 Docket No. 1 at p. 5, ¶ 4.  Mr. Wetch alleged in his complaint that C & F Commercial Ins. provided adjusting and claims services to North River in connection with Mr. Wetch's worker's compensation claim.  1992 Docket No. 1 at p. 5, ¶ 5.  North River and C & F Commercial Ins. specifically admitted they provided the relevant workers compensation insurance and adjusting services in connection with Mr. Wetch's claim.  1992 Docket No. 5, p. 4.

North River and C & F Commercial Ins. filed a very extensive joint answer in which a veritable litany of affirmative defenses were raised, but they never argued that the court lacked personal jurisdiction over them.  See 1992 Docket No. 5.  The case proceeded and was poised to go to trial, but settled on the very eve of trial on October 15, 1993.  Neither North River nor C & F Commercial Ins. ever moved to dismiss for lack of personal jurisdiction in this prior federal case involving these same parties, this same work injury, and this same obligation or lack thereof to pay workers compensation benefits.

In the flurry of court filings leading up to trial, an affidavit was submitted by defendants from one "R. Scott Donovan."  1992 Docket No. 64.  The subject of the affidavit was the distinction between the two named defendants—North River and C & F Commercial Ins.-- and US Fire.  1992 Docket No. 64. Apparently the distinction was being drawn for purposes of determining the appropriate defendant's net worth to submit to the jury in connection with Mr. Wetch's claim for punitive damages.  See 1992 Docket Nos. 57 & 58. Mr. Donovan declared himself to be a Vice President of defendant North River, a New Jersey corporation.  See 1992 Docket No. 64; this case Docket No. 28-1. Mr. Donovan asserted that North River was a separate entity from US Fire.  Id.

Mr. Donovan asserted Mr. Wetch's caption, "Crum & Forster Commercial Insurance Companies" was incorrect and should instead read, "Crum & Forster Commercial Insurance."  Id.  Mr. Donovan asserted the latter entity was not a separate legal entity, but rather was a trade name used by "Crum & Forster, Inc." to do business.  Id.  Mr. Donovan asserted C & F Commerical Ins. had no assets, liabilities, or employees.  Id.  Mr. Donovan further asserted that C & F Commercial Ins. undertook actions on behalf of North River—i.e. that C & F Commerical Ins. was the agent of North River.  Id.  Mr. Donovan assured the court it was not making any contention that North River should not be held liable for any acts undertaken by C & F Commercial Ins. on its behalf.  Id. Finally, as the apparently penultimate point of the affidavit, Mr. Donovan asserted that North River and US Fire were separate insurance companies, each with their own respective annual statements.  Id.  Mr. Donovan asserted

that the annual statement of US Fire had no application whatsoever to North River's financial condition.  Id.

At the same time Mr. Wetch's first bad faith case was before the district court, another bad faith case involving plaintiff Justin Suhn was also before the same court.  See Suhn v. US Fire, Civ. No. 92-5110-MPY.  Patricia Hoek acted as the claims adjustor for both US Fire in the Suhn case and as the claims adjustor for North River in the Wetch case.  See Docket No. 53-5.  If Mr. Donovan's affidavit was truthful and C & F Commercial Ins. has no employees, then Ms. Hoek appears to have been employed by *both* North River and US Fire Ins. *simultaneously* as their claims adjustor.  Id.  Another possibility is that Mr. Donovan's affidavit was untruthful and Ms. Hoek *was* an employee of C & F Commercial Ins.

## B.  Intermediate Events Between the 1992 Bad Faith Case and the 2017 Case

After the 1992 federal bad faith case was settled, Mr. Wetch, Midcontinent, and C & F Commerical Ins. entered into a stipulated agreement to pay Mr. Wetch workers compensation benefits for permanent and total disability related to his work injury.  See Docket No. 1-1, pp. 2-3.  That stipulated agreement was entered before the South Dakota Department of Labor (hereinafter "SDDOL") and was dated November, 1994.  Id.

At some point later, disputes arose regarding the obligations of C & F Commercial Ins. under the terms of the 1994 stipulation.  The gist of the

dispute is that Mr. Wetch believes "defendants"[2] are responsible for 100% of his medical expenses if his work injury was "a contributing factor" to his medical care and treatment. "Defendants" obtained an independent medical exam (IME) from a Dr. Randal Wojciehoski, who opined Mr. Wetch's work injury was 50% responsible for his medical needs. "Defendants" then adopted the position they need only pay 50% of all medical expenses submitted to them by Mr. Wetch. Mr. Wetch maintains Dr. Wojciehoski's opinion buttresses his position—the doctor's opinion verifies his work injury was a contributing factor. So long as his work injury was a contributing factor, according to Mr. Wetch, "defendants" were responsible for the whole of his submitted expenses.

Correspondance to Mr. Wetch setting forth the insurer's position it would only pay 50% of medical expenses was sent on letterhead declaring in bold at the top of the page, "Crum & Forster, part of the FAIRFAX group." See Docket No. 1-3 (April 5, 2012 letter). The interior return address on the letter was "Central Regional Claims Center" in Brookfield, Wisconsin, and underneath the return address was listed US Fire and North River. Id. Linda Hanke signed the letter, with the title of "Claims Examiner," though her signature block does not indicate for which entity—Crum & Forster, United Fire or North River--she was acting as a claims examiner. Id.

---

[2] The court places the word defendants in quotes in this paragraph because Mr. Wetch does not identify which defendant was responsible for which actions. Therefore, the court cannot at this point make that determination either.

Checks that were issued to Mr. Wetch in 2013 and 2014 boldly display the moniker "Crum & Forster." <u>See</u> Docket Nos. 1-8 and 1-12. <u>See also</u> Docket No. 56-2 (checks issued 2014-18, same). On the check stub, Crum & Forster is the *only* name of any insurance entity displayed. <u>Id.</u> On the checks themselves, the name of US Fire appears in smaller lettering directly below larger lettering announcing "Crum & Forster." <u>Id.</u>

In proceedings before the SDDOL in late 2015, C & F Commercial Ins. appeared and defended its position that the medical expenses were not, or not wholly, its obligation to pay under the 1994 stipulation. <u>See</u> Docket No. 1-15. C & F Commerical Ins. never argued that it was not connected to Mr. Wetch's worker's compensation claim or that Mr. Wetch had named the wrong party. <u>Id.</u> It also never argued that the SDDOL had no personal jurisdiction over it. <u>Id.</u>

A 2018 affidavit executed by Jeanine Ramstack casts doubt on Mr. Donovan's assertion in his 1993 affidavit that C & F Commercial Ins. has no employees. In a 2018 affidavit filed in proceedings involving Mr. Wetch's case in South Dakota state court, Ms. Ramstack filed an affidavit purporting to be the "Regional Director for workers compensation claims" for "Crum & Forster Commercial Insurance." <u>See</u> Docket No. 52-1. Furthermore, she makes reference to Mr. Wetch's claims file which Ms. Ramstack said, under oath, consisted of documentation and entries made by Crum & Forster Commercial Insurance "personnel." <u>Id.</u> Thus, unlike Mr. Donovan,

Ms. Ramstack affirmatively identified employees of C & F Commercial Ins., including herself.

During 2017 and 2018, Linda Hanke and Jeanine Ramstack communicated via email with various people in connection with Mr. Wetch's workers compensation claim.  <u>See</u> Docket No. 52-1.  Ms. Hanke identified herself by the title "Senior Specialist, Workers Compensation Claims" for "Crum & Forster."  <u>Id.</u>  Ms. Ramstack, consistent with her affidavit discussed above, identified herself as "Regional Director │ Workers Compensation Claims" "Crum & Forster."  <u>Id.</u>

A title block at the end of each woman's emails has a logo for "Crum & Forster" "a Fairfax Company."  <u>Id.</u>  The tiny print beneath the logo states:

> C & F and Crum & Forster are registered trademarks of United States Fire Insurance Company.  Crum & Forster, which is part of Fairfax Financial Holdings Limited, is comprised of leading and well-established property and casualty business units.  The insurance companies within Crum & Forster, rated A (Excellent) by A.M. Best Company, are United States Fire Insurance Company, The North River Insurance Company, Crum & Forster Indemnity Company, Crum & Forster Specialty Insurance Company, Seneca Insurance Company, Inc., Seneca Specialty Insurance Company, First Mercury Insurance Company, and American Underwriters Insurance Company.

<u>Id.</u>

## C.    Documents Submitted in Support of Motions [Docket Nos. 22, 45-47]

The documents discussed in subsections A and B above were submitted to the court in this lawsuit in support of or opposition to the pending motions, but are discussed separately because they were originally created for use in

other contexts.  Defendants submit an affidavit from Michael McTigue in this lawsuit, created specifically for this case.  <u>See</u> Docket No. 49.

Mr. McTigue states he is "employed by United States Fire Insurance Company ("US Fire"), whose parent is Crum & Forster Holdings Corp., and am a Vice President and Assistant General Counsel."  <u>Id.</u>  This sentence is unclear. Is Mr. McTigue a Vice President and Assistant General Counsel of C & F Holdings?  Or of US Fire?  Both?  Mr. McTigue goes on to state, under oath, there is no reason to keep C & F Holdings in this lawsuit as it is not incorporated in South Dakota, owns no property here, does not do business here, is not an insurer, is not involved in denying workers compensation benefits, does not hire claims adjusters or adjust, settle or pay any claims anywhere, and neither charges nor collects insurance premiums in this state.  <u>Id.</u>

Defendants also submit the affidavit of Sonia Scala, created specifically for these motions.  <u>See</u> Docket No. 24.  Ms. Scala identifies herself as an employee of US Fire and an Assistant Secretary of both US Fire and North River.  <u>Id.</u>  Ms. Scala states that the parent company of all the entities named herein is Fairfax Financial Holdings Ltd.  <u>Id.</u>  Fairfax owns C & F Holdings.  <u>Id.</u> C & F Holdings was created solely to hold the capital stock of a previous entity, C & F Holdings, Inc., which is now dissolved.

Ms. Scala goes on to say C & F Commercial Ins. is not even a legal entity, but a fictitious name that US Fire and North River were allowed to use in their insurance underwriting and claims activities up through 1993.  <u>Id.</u>  She asserts

C & F Commercial Ins. was never a licensed insurer and never held a certificate of authority from the South Dakota Division of Insurance.  Id.  According to Ms. Scala, C & F Commercial Ins. never issued, marketed, or underwrote any insurance policies in South Dakota or anywhere else nor charged or collected insurance premiums.  Id.  Ms. Scala states C & F Commercial Ins. does not adjust, settle or pay any insurance claims anywhere nor does it have express or implied authority to act as the agent of North River or US Fire.  Id.  Ms. Scala, like Mr. Donovan before her, avers that C & F Commercial Ins. has no employees and that it employed no person to handle Mr. Wetch's claim.  Id.

Ms. Scala asserts that Midcontinent's 1991 workers compensation insurance policy—which was in effect when Mr. Wetch was injured—was issued by Westchester Fire Insurance Company, not any of the defendants named herein.  Id.  However, in September, 1993, Ms. Scala asserts US Fire took over Westchester's obligations under its policies, including the obligation for Mr. Wetch's claim.  Id.  Ms. Scala asserts it was only employees of US Fire or Westchester who made decisions about Mr. Wetch's claims and who had contact with Mr. Wetch.  Id.

Ms. Scala states that North River is a wholly owned subsidiary of US Fire, which in turn is wholly owned by C & F Holdings.  Id.  North River admits it does business in South Dakota, but does not own any property here, employ any persons here, or maintain any offices here.  Id.  North River, through Ms. Scala, disavows any connection with the policy of insurance under which Mr. Wetch's claim arose, with his claim, or with the handling of that claim.  Id.

10

Finally, Ms. Scala asserts that C & F Holdings, US Fire, and North River all maintain separate minutes, by-laws, articles of incorporation, and corporate records.  Id.  She also asserts the three entities maintain separate books, accounting records, and banking financial accounts.  Id.

All defendants now move to dismiss all or parts of Mr. Wetch's complaint as against each of them under either Rule 12(b)(2) or (6) or both.  See Docket Nos. 22, 45-47.  Mr. Wetch opposes those motions.  See Docket No. 52.

## DISCUSSION

**A.    Personal Jurisdiction**

### 1.    Standard for a Motion to Dismiss for Lack of Personal Jurisdiction—Rule 12(b)(2)

When personal jurisdiction is challenged by a defendant, the plaintiff has the burden of establishing the court's jurisdiction.  5B Charles Alan Wright & Arthur R. Miller, Fed. Practice & Procedure, § 1351 (3d ed 2004) (hereinafter "Wright & Miller"); Creative Calling Solutions, Inc. v. LF Beauty Ltd., 799 F.3d 975, 979 (8th Cir. 2015).  The court has considerable leeway in choosing the method of resolving the motion.  Wright & Miller.

The court may receive affidavits and written evidence.  Id.; Creative Calling Solutions, Inc., 799 F.3d at 979.  But Rule 12 also gives the court the discretion to delay its determination of personal jurisdiction until further discovery is conducted or even until the trial on the merits.  Wright & Miller; see FED. R. CIV. P. 12(i).  This may be particularly desirable in complex cases. Id.  The fact issues are then left to the jury for determination if the court finds that desirable.  Id.  This also has the benefit of allowing the parties to conduct

discovery on the issue of personal jurisdiction, thus potentially leading to a more accurate decision than one made solely on the basis of affidavits. Id.

Regardless of *when* the issue is tackled, the plaintiff bears the initial burden. Creative Calling Solutions, Inc., 799 F.3d at 979. If the court decides the matter on affidavits and documents instead of live oral testimony, the evidence must be viewed in the light most favorable to the plaintiff. Id. In defending a Rule 12(b)(2) motion on affidavits, a plaintiff must make a *prima facie* showing by alleging sufficient facts to support "a reasonable inference that defendant[] may be subjected to jurisdiction in the forum state." Fastpath, Inc. v. Arbela Techs. Corp., 760 F.3d 816, 820 (8th Cir. 2014). Although ultimately the plaintiff must prove personal jurisdiction by a preponderance of the evidence, evidence sufficient to meet that burden of proof need not be adduced until trial or until the court holds an evidentiary hearing. Epps v. Stewart Information Servs. Corp., 327 F.3d 642, 647 (8th Cir. 2003).

### 2.    Substance of the Law of Personal Jurisdiction

Because this action rests on the court's diversity jurisdiction, South Dakota's substantive law applies. See Erie R. Co. v. Tompkins, 304 U.S. 64 (1938) (federal courts apply the substantive law of the forum state when sitting in diversity jurisdiction). South Dakota's personal jurisdiction statute provides in pertinent part as follows:

> Any person is subject to the jurisdiction of the courts of this state as to any cause of action arising from the doing personally, through any employee, through an agent or through a subsidiary, of any of the following acts:
>
> (1) The transaction of any business within the state;

(2) The commission of any act which results in accrual within this state of a tort action; . . .

(4) Contracting to insure any person, property, or risk located within this state at the time of contracting; . . .

(11) Commencing or participating in negotiations, mediation, arbitration, or litigation involving subject matter located in whole or in part within the state; . . .

(14) The commission of any act, the basis of which is not inconsistent with the Constitution of this state or with the Constitution of the United States.

See SDCL § 15-7-2.

This statute confers jurisdiction to the fullest extent permitted by the Due Process clause of the Constitution.  Bell Paper Box, Inc. v. Trans Western Polymers, Inc., 53 F.3d 920, 921 (8th Cir. 1995) (citing Ventling v. Kraft, 161 N.W.2d 29, 30 (S.D. 1968)).  Therefore, the sole inquiry of the court under Rule 12(b)(2) is whether exercising personal jurisdiction over the three defendants who contest it herein comports with Due Process.  Id.

Personal jurisdiction may be established by showing a basis for "general jurisdiction" or "specific jurisdiction," but either basis must comport with the requirements of the Due Process clause.  Creative Calling Solutions, Inc., 799 F.3d at 979-80.  A court may exercise "general jurisdiction" over a defendant consistent with due process if the defendant's "affiliations with the State are so continuous and systematic as to render it essentially at home in the forum State."  Id. at 979 (quoting Daimler AG v. Bauman, 571 U.S. 117, 127 (2014)) (cleaned up).  A court can exercise "specific jurisdiction" under the Due Process

13

clause if the defendant "has certain contacts with the forum State and the cause of action arises out of those contacts." Id. at 980.

When specific jurisdiction is asserted, there must be certain "minimum contacts" between the defendant and the forum state. Id. The contacts must show "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Id. (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474-75 (1985)). The defendant's contacts with the forum state cannot be merely "random, fortuitous, or attenuated," but must be of such significance that they would cause the defendant to "reasonably anticipate being haled into court there." Id.

In order to determine if the defendant "purposefully availed itself of the forum and established minimum contacts," courts must examine the "nature, quality, and quantity of the defendant's contacts with the forum State and the connection between the cause of action and those contacts." Id. For contract claims, personal jurisdiction exists where the defendant "reaches out beyond one state and creates continuing relationships and obligations with citizens of another state." Id. (quoting Burger King, 471 U.S. at 473). The existence of a single contract is not enough. Rather, the court must evaluate "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." Id. (quoting Burger King, 471 U.S. at 479).

14

In the <u>Creative Calling</u> case, the court determined personal jurisdiction existed where the defendant solicited a business relationship with another company incorporated in the forum state, negotiated a contract with that company over a three-month period, corresponded numerous times via email and telephone in the forum state during pre-contract negotiations, communicated on a near-daily basis with the company in the forum state for a two-year period after the contract was entered into, and shipped thousands of pre-production samples to the forum state for the forum company's approval. <u>Creative Calling Solutions, Inc.</u>, 799 F.3d at 980-81.

Even where there are sufficient minimum contacts, the exercise of personal jurisdiction may still violate due process concerns if, under the circumstances, "traditional notions of fair play and substantial justice" are offended. <u>Id.</u> at 981-82 (quoting <u>Asahi Metal Indus. Co. v. Superior Court</u>, 480 U.S. 102, 113 (1987)). In other words, where exercise of personal jurisdiction is "unreasonable." <u>Id.</u> at 982. To determine the reasonableness of the exercise of personal jurisdiction, the court weighs the interests of the forum state, the burden on the defendant, and the plaintiff's interest in obtaining relief. <u>Id.</u>

In the <u>Creative Calling</u> case, where plaintiff's witnesses were in the forum state, some of defendant's witnesses were in the United States and some in Hong Kong, and some of the evidence which was at the crux of the dispute was in the forum state, the court concluded the interests of the foreign parties were not sufficient to show that the exercise of personal jurisdiction was "unreasonable." <u>Id.</u> Likewise, the parties' non-exclusive forum selection clause

15

in their contract designating Hong Kong as one of many potential forums did not change the balance in favor of the federal court exercising jurisdiction. Id.

The Eighth Circuit has set forth five factors for consideration of whether a defendant has sufficient minimum contacts with the forum state such that the state's assertion of jurisdiction over the defendant comports with due process. To determine personal jurisdiction, the Court should consider (1) the nature and quality of the contacts, (2) the quantity of the contacts, (3) the relationship of the cause of action to the contacts[3], (4) the interest of the forum state in providing a forum for its residents, and (5) the convenience or inconvenience to the parties. The first three factors are of primary importance. Fastpath, Inc. v. Arbela Technologies Corp., 760 F.3d 816, 821 (8th Cir. 2014). In determining whether sufficient minimum contacts exist, the court should consider all of the defendant's contacts in the aggregate and the totality of the circumstances. Northrup King. Co. v. Compania Productora Semillas Algodoneras, S.A., 51 F.3d 1383, 1388 (8th Cir. 1995).

### 3.    Application of the Law to C & F Commercial Ins.

The court clearly has personal jurisdiction over C & F Commercial Ins. The question is not even close. C & F Commercial Ins. waived any personal jurisdiction defense it may have had in regard to Mr. Wetch's 1992 bad faith action in this court by appearing generally and never raising an objection

---

[3] The third factor distinguishes whether the jurisdiction is specific or general. See Digi-Tel Holdings, Inc. v. Proteq Telecomms., Ltd., 89 F.3d 519, 522 n.4 (8th Cir. 1986).

16

based on personal jurisidiction. In its answer to Mr. Wetch's 1992 bad faith complaint, C & F Commercial Ins. admitted it provided the adjusting services as to Mr. Wetch's workers compensation claim. See 1992 Docket No. 5. at p. 4.

C & F Commercial Ins. then voluntarily entered into a stipulation, identifying itself as the "insurer," which stipulation was adopted by the SDDOL, regarding provision of workers compensation benefits to Mr. Wetch in the 1994 stipulation. Since then, it has voluntarily appeared multiple times in proceedings before both the SDDOL and the state courts of South Dakota. The 1994 stipulation along with South Dakota law is the very basis for Mr. Wetch's claims in this court that C & F Commercial Ins. has a duty to pay him workers compensation benefits at all. The motion to dismiss by C & F Commercial Ins. for lack of personal jurisdiction is all but specious.

The affidavit of Ms. Scala does not change this result. According to her, Westchester Fire Insurance Company issued the policy of worker's compensation insurance to Midcontinent which was in effect when Mr. Wetch was injured at work. See Docket No. 24 at p. 4. Supposedly, Westchester was the appropriate entity handling Mr. Wetch's claim until US Fire took over in September, 1993. Id. at p. 5.

Ms. Scala's affidavit fails to explain why, in October 1992, counsel for North River and C & F Commercial Ins. filed an answer to Mr. Wetch's first bad faith complaint *admitting* that "at all times relevant [to Mr. Wetch's claims] North River Insurance Company [**not** Westchester or US Fire] provided worker's

compensation insurance to [Midcontinent]." See 1992 Docket No. 1 at p. 1, ¶ 4; and Docket No. 5 at p. 4, ¶ XI.

Nor does Ms. Scala's affidavit explain why, in October 1992, counsel for North River and C & F Commercial Ins. filed an answer to Mr. Wetch's first bad faith complaint *admitting* that "at all times relevant [to Mr. Wetch's claims] Crum & Forster Commercial Insurance [***not*** Westchester or US Fire] provided adjusting and claims services to the Insurer, North River." See 1992 Docket No. 1 at p. 1, ¶ 5; and Docket No. 5 at p. 4, ¶ XI.  Ms. Scala would have this court accept her word that only Westchester or US Fire had any claims handling responsibilities for Mr. Wetch's claim, despite the admissions made by North River and C & F Commercial in the earlier 1992 litigation.

Significantly, the court notes that the stipulation settling Mr. Wetch's entitlement to workers compensation benefits was signed in November, 1994. See Docket No. 1-1.  According to Ms. Scala, this was 13 months *after* US Fire had assumed responsibility for Mr. Wetch's claim (in September, 1993).  Yet the named party in that stipulation is "Crum & Forster Commercial Ins., ***Insurer***," *not* US Fire.  Id. (emphasis added).  Did defendants perpetrate a fraud on the parties and the SDDOL in 1994?  Or are they trying to perpetrate a fraud now?  In late 2015, C & F Commercial Ins. again appeared before the SDDOL under a caption identifying it as "insurer" and filed a response to Mr. Wetch's summary judgment motion, never "revealing" that it was not a legal entity, let alone not the "insurer."  See Docket No. 1-15.

Finally, both Ms. Scala and Mr. Donovan assert that C & F Commercial Ins. is a name only and that there are no employees of this entity. See Docket Nos. 24 & 28-1. However, Jeanine Ramstock submitted an affidavit in South Dakota state court in June, 2018—just six months ago—stating in connection with further litigation over Mr. Wetch's claim that she *was* an employee of C & F Commercial Ins. See Docket No. 52-1. Furthemore, Ms. Ramstock averred under oath that C & F Commercial Ins. employed "personnel" who handled Mr. Wetch's claim. Id. Finally, Ms. Ramstock appeared in person in that state court proceeding as a representative of C & F Commercial Ins. See Docket No. 53-1 at p. 3, lines 16-20; p. 4, line 1; p. 5, line 13.

Whether C & F Commercial Ins. is perpetrating a fraud now, or did so in past litigation relating specifically to Mr. Wetch and specifically to this claim, is not necessary to sort out at this juncture. The court concludes there are sufficient grounds for the assertion of specific personal jurisdiction over C & F Commercial Ins.

Mr. Wetch must show C & F Commercial Ins. had contacts showing "some act by which the defendant purposefully availed itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Creative Calling Solutions, 799 F.3d at 980 (quoting Burger King Corp., 471 U.S. at 474-75). The defendant's contacts with the forum state cannot be merely "random, fortuitous, or attenuated," but must be of such significance that they would cause the defendant to "reasonably anticipate being haled into court there." Id. Here, Mr. Wetch has shown that

19

C & F Commercial Ins. availed itself of South Dakota forums—administrative, state court and federal court--for the better part of the last 25 years essentially litigating the same work-related injury from July, 1991.

Nor does this court's exercise of jurisdiction over C & F Commercial Ins. offend "traditional notions of fair play and substantial justice." Creative Calling Solutions, Inc. 799 F.3d at 981-82 (quoting Asahi Metal Indus. Co., 480 U.S. at 113). The exercise of personal jurisdiction over C & F Commerical Ins. is eminently reasonable where that entity has represented over and over that it is the "insurer" or "claims adjuster" and has itself taken advantage of South Dakota's administrative, state and federal courts in an attempt to defeat Mr. Wetch's claim to insurance benefits. Id. at 982. Especially because of the conflicting sworn testimony submitted in various forums in this state, South Dakota has a keen interest in getting to the bottom of this shell game and finding out the truth. Mr. Wetch has satisfied his burden to establish personal jurisdiction over C & F Commercial Ins.

The court recommends this defendant's motion to dismiss based on lack of personal jurisdiction be denied. In the alternative, the court recommends the parties be allowed full discovery up to the date of trial and that defendant C & F Commercial Ins. be allowed to raise the issue once again at the conclusion of the trial.

### 4.    Application of the Law to North River

The analysis is much the same for North River. North River admits it is licensed to sell insurance policies in South Dakota and that it does so. See

Docket No. 23 at pp. 11-12.  This satisfies one of the specific grounds upon which South Dakota asserts the right to exercise personal jurisdiction over North River.  See SDCL § 15-7-2(4).  But that is only a small portion of the basis of this court's exercise of personal jurisdiction over North River.

Mr. Wetch named North River as the insurer in his 1992 bad faith case. North River admitted that it was the insurer and waived any argument it may have had that the court lacked personal jurisdiction over it.  Just prior to trial, North River filed an affidavit from Mr. Donovan admitting that North River was the entity responsible for handling Mr. Wetch's claim and asserting that the court should consider only North River's financial status when deciding what evidence regarding punitive damages would be allowed to go to the jury.  See Docket No. 28-1.  Unless North River was perpetrating a fraud on the court in 1992, there is sufficient evidence to exercise specific jurisdiction over North River in this case—by it's own admission, it was the insurer for Mr. Wetch's claim.  This case involves the same plaintiff, the same workers compensation claim from the same work-related injury.

North River asserts in this litigation that, in fact, US Fire was the insurer for Mr. Wetch's claim.  US Fire alone among the defendants named in Mr. Wetch's amended complaint does not contest that this court has personal jurisdiction over it.  Again, the court is faced with the issue of determining whether North River was lying in 1992 when it urged the district court to consider only its own financial situation and not US Fire's, or whether it is lying now.  North River admitted and also affirmatively asserted in 1992

through the Donovan affidavit that it was the insurer who provided Midcontinent with workers compensation insurance covering Mr. Wetch's work injury. Now it wants the court to believe it never was the insurer, but that Westchester and then US Fire were the insurers.

Mr. Wetch has adduced proof showing that the same claims adjustor who was handing Mr. Wetch's claim for North River in 1993 was simultaneously handling the claim for Justin Suhn on behalf of US Fire, also in 1993. See Docket No. 53-5. The fact that US Fire and North River were using the services of the same claims adjustor at the exact same time provides further evidence that North River and US Fire are not the fully distinct entities they would have this court believe. That, plus US Fire's concession of this court's personal jurisdiction over it, adds substance to Mr. Wetch's argument that this court has personal jurisdiction over North River. North River's course of conduct over the last 25 years in South Dakota relating to Mr. Wetch's worker's compensation claims was such that North River should have reasonably anticipated being haled into court here. Nor is it unreasonable for the court to exercise jurisdiction over North River at this late date. The state of South Dakota has a vested interest in getting some answers to the question of who is really responsible for Mr. Wetch's workers compensation benefits after having entertained litigation over that issue for 25 years.

The court recommends denying North River's motion to dismiss for lack of personal jurisdiction or, in the alternative, allowing full discovery and

revisiting the issue of personal jurisdiction over North River at the conclusion of the trial.

### 5.    Application of the Law to C & F Holdings

The evidence with regard to C & F Holdings is much different. South Dakota's long arm statute purports to extend the state's personal jurisdiction to parent corporations if their subsidiaries sell insurance in this state. See SDCL § 15-7-2. However, that alone does not comport with due process requirements. Epps, 327 F.3d at 650.

When a plaintiff seeks a court's exercise of personal jurisdiction over a nonresident parent corporation based on the activities of the nonresident corporation's subsidiary, the plaintiff must show that the "parent so controlled and dominated the affairs of the subsidiary that the latter's corporate existence was disregarded so as to cause the [subsidiary] corporation to act as the [parent] corporate defendant's alter ego." Epps, 327 F.3d at 649. If the subsidiary corporation, which has sufficient minimum contacts with the forum, acts as the alter ego of its parent corporation, which does not by itself have minimum contacts, the subsidiary's contacts are attributed to the parent corporation and due process is satisfied. Id.

> A corporation is not doing business in a state merely by the presence of its wholly owned subsidiary. . . . However, the fiction of corporate entity may be disregarded, where one corporation is so organized and controlled and its affairs are so conducted that it is, in fact, a mere instrumentality or adjunct of another corporation. *Even a non-owned corporation may act as agent for another corporation.* No all embracing rule has been laid down under which the relationship between two corporations may be determined. The circumstances in each case must be examined to determine whether a corporation through the activities of another

23

corporation has subjected itself to jurisdiction in a state under its
long arm statute.

Id. (quoting from Lakota Girl Scout Council, Inc. v. Havey Fund-Raising Mgmt.,
Inc., 519 F.2d 634, 637 (8th Cir. 1975)) (emphasis added by the Epps court).

When a court seeks to exercise personal jurisdiction over a parent
corporation under the above principles, one way to do so is to pierce the
corporate veil. Id. State law controls the question of whether and how the
corporate veil may be pierced. Id. But piercing the corporate veil or proving
the subsidiary is the "alter ego" of the parent are not the exclusive routes to
securing personal jurisdiction. Viasystems, Inc. v. EBM-Papst St. Georgen
GmbH & Co., KG, 646 F.3d 589, 596 (8th Cir. 2011); Anderson v. Dassault
Aviation, 361 F.3d 449, 452 (8th Cir. 2004).

In the Epps case, applying Arkansas veil-piercing law, the court
concluded the Arkansas district court lacked jurisdiction over the parent
corporation. Id. The parent corporation claimed the subsidiary's assets and
debts on its SEC[4] 10-K filing and claimed the subsidiary's "5,000 locations"
throughout the United States. Id. at 646 n.4, 650. Also, the parent and
subsidiary shared some common corporate officers. Id. Finally, documents
from the subsidiary identified it as "a SISCO company," the name of the parent.
Id. Despite these facts, the court held there were insufficient facts to exercise
personal jurisdiction over the parent corporation based on the subsidiary
corporation's contacts with Arkansas. Id. at 650.

---

[4] Securities and Exchange Commision.

In the <u>Dassault</u> case, the court found the parent and wholly-owned subsidiary had "a close, synergistic relationship that is not an abuse of the corporate organizational form, but is clearly relevant to the jurisdictional question." <u>Dassault Aviation</u>, 361 F.3d at 453.  The majority of jet airplanes sold by the parent corporation worldwide flew in and out of Arkansas, the forum state, to be finished according to customers' specifications by the subsidiary.  <u>Id.</u>  The finish work was done at an Arkansas production site owned by the subsidiary, which was the parent's largest production site in the world.  <u>Id.</u>  Additionally, the subsidiary was the exclusive distributor of the parent's jets in the western hemisphere.  <u>Id.</u>

In its annual report, the parent touted its especially significant presence (through the subsidiary), in the state of Arkansas.  <u>Id.</u>  The parent and subsidiary jointly operated and administered a website, which set forth a "time line" that merged the two companies and emphasized consolidation efforts.  <u>Id.</u> The time line also touted the Arkansas connection, emphasizing the importance of the Arkansas facility to the success of both companies.  <u>Id.</u> Finally, the President and CEO of the subsidiary were also officers and directors of the parent—*and all the compensation of the CEO of the subsidiary was paid by the parent company*.  <u>Id.</u> at 454.

Other evidence was that both companies used the word "Dassault" in their name and used a common logo.  <u>Id.</u>  One joint officer testified the companies "unify the efforts of both [parent] and [subsidiary] to create this brand and logo image."  <u>Id.</u>  The companies jointly published a "Falcon

25

Operator Directory" which listed 17 Dassault jets owned and operated by Arkansas residents.  Id.  The directory listed contact information for a "field service representative" and an "authorized service center," both in Arkansas.  Id.  The companies' jointly published newsletter included a special section reporting Arkansas-related news.  Id.  Not only did the documents submitted to the court show a joint marketing strategy by the parent and subsidiary, but it was a marketing strategy that highlighted the Arkansas connection.  Id.  The court found the parent purposefully directed its marketing and sales efforts to the United States and singled out Arkansas for those efforts.  Id.  Based on these facts, the court held Arkansas could permissibly assert personal jurisdiction over the parent corporation based on the subsidiary's presence and activities in the forum.  Id. at 455.

In George v. Uponor Corp., 988 F. Supp. 2d 1056, 1065 (D. Minn. 2013), the court found personal jurisdiction at least preliminarily based on the plaintiff's *prima facie* showing at the Rule 12(b)(2) motion stage.  Although there were 3 levels of subsidiaries between the parent and subsidiary named in the litigation, each company in the chain wholly owned the one below it, with the result that the parent wholly owned the subsidiary named.  Id.  The parent's annual report demonstrated that the various subsidiaries viewed themselves as a "single enterprise divided by geographic reporting regions," with the parent at the head.  Id.  The parent referred to itself and its subsidiaries as a single business entity—the "Uponor Group"—selling products

26

worldwide.  Id.  The evidence showed the Finnish parent treated its American subsidiary as simply one region of its worldwide business.  Id.

The companies operated separate websites, but the "about us" section of the subsidiary's website suggested a "symbiotic" relationship with the parent. Id. at 1066.  The website stated the subsidiary "is a part of [the parent], which also includes [other subsidiaries]" and was led by a single president in Finland. Id.  The parent claimed the subsidiary's profits and liabilities as its own.  Id. Furthermore, the parent corporation had repeatedly touted its connection to Minnesota, the forum state, by claiming the product brand its subsidiary produced there was the "best-known brand" in North America, that its subsidiary's manufacturing plant in Minnesota was the parent's manufacturing center in the United States, listing Minnesota as the locus of "Region management," and that Minnesota had repealed plumbing code restrictions making sales of the subsidiary's product blossom.  Id.

The parent had submitted an affidavit to the court asserting it was a holding company only, conducted no business in the United States, and never designed, developed, or sold any products there.  Id.  The plaintiffs submitted contradictory documents showing the parent claimed 13% of its staff was in the United States and setting aside money belonging to the parent company to address the cost of residential plumbing problems in the United States.  Id. Although the court held plaintiffs had satisfied their burden to demonstrate a *prima facie* case at the 12(b)(2) motions stage, it reminded the plaintiffs the

burden remained on them to demonstrate jurisdiction over the parent by a preponderance of the evidence at trial.  Id.

Plaintiffs submit evidence that C & F Holdings claims the assets and liabilities of all its subsidiaries.  They point out that North River and US Fire are wholly owned subsidiaries of C & F Holdings.  They adduce evidence of the sharing of a website, www.cfins.com, and email system.  They point out that all the various entities share the "Crum & Forster" and "C & F" logos.  They point out that Marc Adee is CEO of C & F Holdings and used to be the president of three different subsidiary companies owned by C & F Holdings.

Although the documents submitted by the parties are replete with logos and other identifiers for "C & F" and "Crum & Forster," these are registered trademarks belonging to US Fire, and are clearly declared as such.  See Docket No. 24 at p. 5, ¶ 26; Docket No. 52-1.  There is a significant shortage of anything identified as "Crum & Forster Holdings Corp."  Unlike C & F Commercial Ins. and North River, C & F Holdings was never a named party to Mr. Wetch's 1992 bad faith case, it was not a party to the 1994 stipulated settlement which forms the basis for Mr. Wetch's current causes of action, it never appeared in any SDDOL proceedings that the parties have brought to this court's attention, and it never appeared as a party in any proceeding before a state court of South Dakota.

Both parties agree that the corporate structure of the various parties are as follows.  Fairfax Financial Holdings Ltd. (not a named party herein), wholly owns US Fire and North River through its holding company, C & F Holdings.  A

2017 Fairfax annual report repeatedly makes reference to a company identified only as "Crum & Forster." See Docket No. 53-6 at pp. 4, 5, & 8. Notably, Fairfax's annual report does not identify this company as "Crum & Forster Holdings Corp." nor as "Crum & Forster Commercial Insurance," but simply as "Crum & Forster." Id. In Fairfax's annual report, it states that "Crum & Forster" "is a national commericial property and casualty insurance company in the United States writing a broad range of commercial, principally specialty, coverages. In 2017, C & F's net premiums written were US$1,863.4 million. At year-end, the company had statuory surplus of US$1,302.3 milion and there were 2,298 employees." Id. at p. 4.

Although the 2017 Fairfax annual report does not identify whether the Crum & Forster entity it discusses is in fact "Crum & Forster Holdings Corp." as named in Mr. Wetch's amended complaint, Mr. Wetch asserts that the above numbers reported for "Crum & Forster" in the annual report are very similar to the numbers reported for C & F Holdings for 2017. But this establishes only that C & F Holdings claims the assets and debts of its wholly owned subsidiaries—not surprising and not sufficient to establish personal jurisdiction over the parent standing alone.

But the issue is not whether C & F Holdings does or does not issue insurance policies or collect premiums. The question is whether it did so in South Dakota and/or whether it did so in connection with Mr. Wetch's case— or whether it has any other contacts with South Dakota. There is zero evidence of any of these.

Mr. Wetch relies heavily on decisions in <u>Uponor</u> and <u>Dassault</u>, but what was present in each of those decisions is what is conspicuously missing here. The parent corporations in those cases not only presented a "symbiotic" relationship with the subsidiary corporations, the parents specifically touted their connections to the forum states, which connection was through the subsidiaries' activities and property holdings in the forum states. Here, there is no evidence whatsoever that C & F Holdings touted its relationship to South Dakota through North River, C & F Commercial Ins., or US Fire.

Also, although Marc Adee appears to be climbing the corporate ladder from holding office with subsidiaries to doing so at the parent level, Mr. Wetch does not assert he held these corporate offices for the various entities *simultaneously*. Furthermore, although Sonia Scala is an officer in both US Fire and North River simultaneously, this does not further Mr. Wetch's cause to show symbiosis between *C & F Holdings* and one of the subsidiaries.

The facts presented with Adee and Scala are a far different situation than the situation described in <u>Dassalt</u> where two persons held *simultaneous* officer-level positions in both the subsidiary and the parent and, with regard to the CEO of the subsidiary, the parent paid the subsidiary CEO's salary. Under the facts and circumstances presented by Mr. Wetch as his *prima facie* showing, C & F Holdings would not reasonably anticipate being haled into court in South Dakota solely on the basis of the activities of its subsidiaries.

Mr. Wetch requests permission to take the deposition of Marc Adee, the person who had held officer-level positions at some of C & F Holdings'

subsidiaries and now holds such a position at C & F Holdings, and to conduct other discovery.  The court specifically grants such permission, giving the parties 60 days to conduct additional discovery, including taking Mr. Adee's deposition.  If additional evidence is obtained, it can be used to ask this court to reconsider its recommendation herein or, alternatively, the findings can be presented to the district court to support objections to this report and recommendation.  Based on the evidence and arguments adduced thus far by Mr. Wetch, this magistrate judge recommends granting the motion to dismiss by C & F Holdings based on lack of personal jurisdiction.  The documents before the court do not create a *prima facie* case for Mr. Wetch, even viewing those documents in the light most favorable to Mr. Wetch.

## C.    Failure to State a Claim

### 1.    Standard for Rule 12(b)(6) Motions

Defendants argue Mr. Wetch has failed to state a claim as to some or all of the counts in his amended complaint.  This argument is based on Rule 12(b)(6) of the Federal Rules of Civil Procedure.

Mr. Wetch urges the court to apply an incorrect standard to these motions.  It *used* to be the law that to properly dismiss a claim under Rule 12(b)(6), the court "would have to conclude that there is *no set of facts* that would permit a plaintiff to" recover on his or her claim.  Conley v. Gibson, 355 U.S. 41, 45-46 (1957)(emphasis added).  Mr. Wetch cites to this "no set of facts" language from Conley in support of his position.  However, Conley has not been the law since 2007, 11 years ago when the Supreme Court decided

31

Atlantic Corp. v. Twombly, 550 U.S. 544 (2007). The Twombly Court
specifically abrogated the Conley no-set-of-facts standard. Twombly, 550 U.S.
at 553.

Instead, the Court held plaintiffs must plead "enough facts to state a
claim to relief that is *plausible* on its face." Twombly, 550 U.S. at 570
(emphasis added). Under Federal Rule of Civil Procedure 8(a)(2), a plaintiff
must plead only "a short and plain statement of the claim showing that the
pleader is entitled to relief." Id. at 554-55 (quoting FED. R. CIV. P. 8(a)(2)). A
complaint does not need "detailed factual allegations" to survive a motion to
dismiss, but a plaintiff must provide the grounds for his entitlement to relief
and cannot merely recite the elements of his cause of action. Id. at 555 (citing
Papasan v. Allain, 478 U.S. 265, 286 (1986)). There is also a "plausibility
standard" which "requires a complaint with enough factual matter (taken as
true)" to support the conclusion that the plaintiff has a valid claim. Id. at 556.
The plaintiff's complaint must contain sufficiently specific factual allegations in
order to cross the line between "possibility" and "plausibility" of entitlement to
relief. Id.

There are two "working principles" that apply to Rule 12(b)(6) motions.
Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). First, courts are not required to
accept as true legal conclusions "couched as factual allegation[s]" contained in
a complaint. Id. (citing Papasan, 478 U.S. at 286). "Threadbare recitals of the
elements of a cause of action, supported by mere conclusory statements, do
not suffice." Id. (quoting Twombly, 550 U.S. at 555). Rule 8 "does not unlock

the doors of discovery for a plaintiff armed with nothing more than conclusions." Iqbal, 556 U.S. at 678-79.

Second, the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 679 (quoting decision below Iqbal v. Hasty, 490 F.3d 143, 157-158 (2d Cir. 2007)). Where the plaintiff's allegations are merely conclusory, the court may not infer more than the mere possibility of misconduct, and the complaint has alleged--but has not "show[n]"--that he is entitled to relief as required by Rule 8(a)(2). Iqbal, 556 U.S. at 679 (emphasis added).

The Court explained that a reviewing court should begin by identifying statements in the complaint that are conclusory and therefore not entitled to the presumption of truth. Id. at 679-680. Legal conclusions must be supported by factual allegations demonstrating the grounds for a plaintiff's entitlement to relief. Id. at 679; Twombly, 550 U.S. at 555; FED. R. CIV. P. 8(a)(2). A court should assume the truth only of "well-pleaded factual allegations," and then may proceed to determine whether the allegations "plausibly give rise to an entitlement to relief." Iqbal, 556 U.S. at 679.

As the discussion above demonstrates, a Rule 12(b)(6) motion requires the court to focus on a plaintiff's pleading of a claim in his or her complaint. See FED. R. CIV. P. 12(b)(6); Iqbal, 556 U.S. at 679. However, courts evaluating a Rule 12(b)(6) motion are not strictly limited to evaluating the complaint. Dittmer Properties, L.P. v. F.D.I.C., 708 F.3d 1011, 1021 (8th Cir. 2013). Courts may also consider "matters incorporated by reference or integral to the

claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned." Id. (citing Miller v. Redwood Toxicology Lab., Inc., 688 F.3d 928, 931 n.3 (8th Cir. 2012) (quoting Wright & Miller § 1357)). These are the standards that govern the portion of defendants' motions premised on Rule 12(b)(6).

### 2.    Count Five—Exploitation Count

#### a.    South Dakota's Statutory Scheme

All defendants move to dismiss count five of Mr. Wetch's amended complaint, alleging he has failed to state a claim. In count five of his complaint, Mr. Wetch alleges a state law claim based on SDCL ch. 22-46. See Docket No. 44 at p. 16, ¶¶ 135-40.

He alleges he is an "adult with a disability" as defined by that legislation and that defendants are "caretakers" under the law because they are "entities entrusted with Wetch's workers' compensation benefits, or responsible for his health or welfare, and assumed this position of trust or responsibility voluntarily through their insurance contract with Wetch's employer, through the Settlement Agreement, or through orders and judgments of the" SDDOL and/or South Dakota state court. Id. Mr. Wetch alleges defendants exploited him by wrongfully taking control over his property—his workers compensation benefits—with the intent to defraud Mr. Wetch. Id. He alleges defendants' actions caused him emotional, psychological, and physical abuse as defined by

SDCL § 22-46-1.  Id.  He seeks compensatory and punitive damages and attorney's fees.  Id.

Chapter 22-46 of South Dakota Codified Laws makes it a crime for any person who physically abuses or neglects an elder or adult with a disability. See SDCL § 22-46-2.  The scheme also makes it a crime if "any person" who has voluntarily assumed a duty by written contract, by receiving payment for care, or by order of a court, to provide support of an adult with a disability, and having been entrusted with that disabled adult's property, appropriates the property with intent to defraud for a use or purpose not in the lawful execution of that person's trust.  See SDCL § 22-46-3.  This crime is defined as "theft by exploitation."  Id.

The scheme does not define "any person."  It does define "adult with a disability" as "a person eighteen years of age or older who has a condition of intellectual disability, infirmities of aging as manifested by organic brain damage, advanced age, or other physical dysfunctioning to the extent that the person is unable to protect himself or herself or provide for his or her own care."  See SDCL § 22-46-1(1).  A "caretaker" is defined as "a person or entity who is entrusted with the property of an . . . adult with a disability, or who is responsible for the health or welfare of an . . . adult with a disability, and who assumes the position of trust or responsibility voluntarily, by contract, by receipt of payment, or by order of the court."  Id. at (2).  "Exploitation" is defined as "the wrongful taking or exercising control over property of an . . .

adult with a disability with intent to defraud the . . . adult with a disability."

Id. at (5).

Finally, the scheme contains the following provision:

> A court may find that an . . . adult with a disability has been exploited as defined in § 22-46-1 or 22-46-3. If a court finds exploitation occurred, the . . . adult with a disability has a cause of action against the perpetrator and may recover actual and punitive damages for the exploitation. The action may be brought by the . . . adult with a disability, or that person's guardian, conservator, by a person or organization acting on behalf of the . . . adult with a disability with the consent of that person or that person's guardian or conservator, or by the personal representative of the state of a deceased . . . adult with a disability without regard to whether the cause of death resulted from the exploitation. The action may be brought in any court of competent jurisdiction to enforce the action. A party who prevails in the action may recover reasonable attorney's fees, costs of the action, compensatory damages, and punitive damages.

See SDCL § 22-46-13.

In addition to the civil penalties described in § 22-46-13, the scheme states that a court make also impose additional remedies such as revocation of a revocable instrument or nomination and severance of the interests of the victim from the interests of the perpetrator in any jointly held property. See SDCL § 22-46-14. In addition, the court may authorize remedies provided under SDCL § 21-65-12. See SDCL § 22-46-17. Finally, the South Dakota legislature made clear that the remedies provided for in the scheme are in addition to and cumulative of other legal and administrative remedies available to the victim. See SDCL § 22-46-18.

### b.  The Parties' Arguments

The South Dakota Supreme Court has not had occasion to interpret § 22-46-13, the provision in the statutory scheme creating civil liability.  In State v. Warren, 462 N.W.2d 195 (S.D. 1990), the court did interpret the criminal statute, § 22-46-3, upon which § 22-46-13 is based.  The evidence showed an elderly man, Hess, was disabled, extremely hard of hearing, and with deteriorating eyesight and physical health.  Id. at 195-96.  He moved into Myria Warren's home on the cusp of turning 90 and after selling a sizeable ranch; Hess agreed to pay Warren a monthly fee for taking care of him.  Id. Hess had no children or a spouse, only two nephews who lived in locations remote from Hess.  Id.  Ms. Warren was almost completely in control of every detail of Hess's personal and financial life.  Id.  She extracted 3 certificates of deposit from Hess and several checks worth tens of thousands of dollars.  Id. Ms. Warren explained the money represented gifts and rent, but the evidence showed Hess was not in the habit of giving extravagant gifts[5] and the rent was far in excess of that charged to other elderly residents of Ms. Warren's home.  Id.  The court held the evidence adduced at trial was sufficient to demonstrate defendant Ms. Warren's guilt beyond a reasonable doubt of theft by exploitation of an elder.  Id. at 200-01.  Unfortunately, the Warren decision does not shed much light on the issues raised by the parties.

---

[5] Examples of the types of gifts Hess customarily gave were $10 to relatives and friends at Christmas and a used color television as a wedding gift.  Warren, 462 N.W.2d at 201.

Defendants argue that they are not "caretakers" and that Mr. Wetch is neither an "elder" nor an "adult with a disability" under the above statutory scheme. Thus, they argue Mr. Wetch has failed to state a claim as to count five.

Defendants argue Mr. Wetch is not an "elder" because he is not over the age of 65, a proposition with which Mr. Wetch does not disagree. See SDCL § 22-46-1(3). Additionally, defendants assert Mr. Wetch does not suffer from any intellectual disability and, although he has physical disabilities, those disabilities are not the result of aging. Therefore, defendants argue Mr. Wetch is also not an "adult with a disability." See SDCL § 22-46-1(1).

Mr. Wetch reads the statute differently. He argues the statute defines "adult with a disability" as any person over the age of eighteen who (1) has an intellectual disability, *or* (2) who has infirmities of aging as manifested by organic brain damage, *or* (3) who is of advanced age, *or* (4) who has "other physical dysfunctioning to the extent that the person is unable to protect himself or herself or provide for his or her own care." See SDCL § 22-46-1(1). Reading the statute as setting forth four separate categories of adults with disabilities results in the conclusion that "physical dysfunctioning" is not modified by "infirmities of aging" or "advanced age."

This court agrees with Mr. Wetch's reading of the statute. The conditions in the definition of "adult with a disability" are set forth in the disjunctive. Satisfaction of any one of the four categories set forth results in the conclusion that the person is an "adult with a disability." Id. Defendants agree Mr. Wetch

is physically disabled.  Facially, then, Mr. Wetch has pleaded a claim that he is a disabled adult.

Defendants also argue they are not "caretakers" and Mr. Wetch counters they are "caretakers."  What neither party acknowledges is that it is not necessary for defendants to be "caretakers" for liability to attach under the scheme.  Section 22-46-13 speaks in the inactive voice:  if an adult with a disability has been exploited [by someone], a cause of action accrues against "the perpetrator."  See SDCL § 22-46-13.  The statute requires that there must have been exploitation as defined under §§ 22-46-1 and 22-46-3.  See SDCL § 22-46-13.

Section 22-46-3, of which  22-46-13 is derivative, does not use the word "caretaker" either.  Instead, it makes it a crime for "any person" with intent to defraud to appropriate property of an adult with a disability so long as the "person" has a duty to provide support to, or is entrusted with the property of, an adult with a disability.  SDCL § 22-46-3.  "Exploitation" is simply the wrongful taking or exercising of control over the property of an adult with a disability with the itent to defraud them.  SDCL § 22-46-1(5).  Exploitation is not limited to "caretakers."  Id.  Thus, defendants' argument that they are not "caretakers" is unavailing.  The South Dakota scheme does not require them to be "caretakers" for liability to attach.

In fact, anomylously, the South Dakota statutory scheme defines "caretaker," but never uses the term "caretaker" in describing any of the acts prohibited by the scheme.  Compare SDCL 22-46-1(2) (defining "caretaker"),

with §§ 22-46-2 (describing abuse of an elder or disabled adult by "any person"), 22-46-3 (describing theft by exploitation from an elder or disabled adult by "any person"), and 22-46-13 (allowing civil recovery for violation of § 22-46-3 against "the perpetrator").

In fact, the only time the statutory scheme ever uses the defined term "caretaker" is in the list of information a person who is reporting an incident of elder or disabled adult abuse/exploitation must give to authorities. See SDCL § 22-46-12(3). And, in this context, it is clear that "caretaker" is conceived of separately from "perpetrator" because the two constitute two separate items of information required to be included in a report of elder or disabled adult abuse. Id. at (3) & (4). Incredibly, then, the South Dakota legislature defined the term "caretaker" and never again used it in its statutory scheme to define the limits of liability under the scheme. See SDCL ch. 22-46.

Defendants cite a number of cases from other jurisdictions to support their argument that Mr. Wetch cannot state a claim against them. The court finds these extra-forum cases to be mostly inapposite.

The Florida statute at issue in Petrano v. Nationwide Mut. Fire Ins. Co., 2013 WL 1325201 ** 4-5 (N.D. Fla. Feb. 4, 2013), created liability for any "relative, caregiver, or household member" who abused an elder. Because Nationwide was not a "relative, caregiver, or household member" of the plaintiff, the court found the elder abuse claim against the insurer to be "frivolous" under Fed. R. Civ. P. 11. Id. The Florida statute differs from South Dakota's statute because "caregiver" is a term used in the liability-creating portion of the

40

statute.  South Dakota's statute, as discussed above, uses the phrase "any person."  See SDCL §§ 22-46-3, 22-46-13.

The Oregon elder abuse statute construed in Bates v. Bankers Life & Cas. Co., 993 F. Supp. 2d 1318, 1344-45 (D. Ore. 2014), required that the bad actor had to have acquired money or property from the elder under a bailment or trust scenario.  Because the insurer on a long-term-care insurance policy had not acquired premiums from the plaintiffs under either a trust or a bailment situation, the court held plaintiffs failed to state a claim under the Oregon elder abuse statute.  Id.  On appeal to the Ninth Circuit, that court certified the question to the Oregon Supreme Court whether plaintiffs in the had stated a claim for elder abuse.  Bates v. Bankers Life & Cas. Co., 849 F.3d 846 (9th Cir. 2017).

The Oregon Supreme Court agreed with the Oregon federal district court: under Oregon's elder financial abuse statute, an insurer who delays or refuses to pay claims does not commit elder financial abuse.  Bates v. Bankers Life & Cas. Co., 408 P.3d 1081, 1082 (Or. 2018)  Key to the court's decision was its holding that the Oregon statute only applied in bailment situations:  where an elder entrusts his or her property or money to the bad actor and later requests its return, but the bad actor refuses to return the property.  Id. at 1085.[6]

---

[6] The Oregon statute defined financial elder abuse as "when a vulnerable person requests that another person *transfer to the vulnerable person any money or property that the other person holds or controls* and that belongs to or is held in express trust, constructive trust or resulting trust for the vulnerable person, and the other person, without good cause, either *continues to hold the money or property or fails to take reasonable steps to make the money or property readily available* to the vulnerable person when:  (A) the *ownership or*

41

The South Dakota statute, unlike Oregon's statute, does not require a trust or bailment situation, as evidenced by the <u>Warren</u> decision:  in that criminal case, in which the conviction was affirmed on appeal, there was no allegation that Hess had given his CDs and checks to Warren as a bailment or trust.  So, under South Dakota law, a bailment or trust is not a necessary element to a claim of financial exploitation of an elder or disabled adult.

Defendants cite cases outside South Dakota for the proposition that courts have refused to extend elder abuse statutes to situations involving employers, common carriers, medical care providers, and hospitals.  <u>See</u> Docket No. 55 at pp. 3-7.  But defendants do not demonstrate similarlity between the statutes construed in those cases and South Dakota's statute here—specifically the fact that South Dakota describes the crime of elder abuse as potentially being perpetrated by "any person," not just a "caregiver."  <u>See</u> SDCL §§ 22-46-3, 22-46-13.

The Arizona statute construed in <u>Haldiman v. Continental Cas. Co.</u>, 2014 WL 584305 at *6 (D. Az. Feb. 13, 2014), comes closest to being analogous to the South Dakota statutory scheme.  The Arizona statute provided a person "who is in a position of trust and confidence to a vulnerable adult shall use the vulnerable adult's assets solely for the benefit of the vulnerable adult."  The

_control of the money or property was acquired_ in whole or in part by the other person or someone acting in concert with the other person _from the vulnerable person_; and (B) the other person acts in bad faith, or knew or should have known of the right of the vulnerable person to have the money or property transferred as requested or otherwise made available to the vulnerable person." <u>Bates</u>, 408 P.3d at 1083 (quoting ORS 124.110) (emphasis by the <u>Bates</u> court) (cleaned up).

statute defined "position of trust and confidence" as a person who assumed a duty to care for the adult, a joint tenant or tenant in common, or a person in a fiduciary or confidential relationship with the adult.  Id. (quoting A.R.S. § 46-456(I)(4)).

In Arizona, an insurer is not a fiduciary for its insured.  Id.  Nor did Continental's relationship with Haldiman constitute a confidential relationship under Arizona law because such a relationship would require a situation where the insurer was bound to act for the insured's benefit and could take no advantage to itself from its acts relating to the insured.  Id.  The purchase of an insurance policy did not create a confidential relationship.  Id.

Unlike Arizona's statute, South Dakota does not limit liability to a "person who is in a position of trust and confidence."  Rather, South Dakota's statute purports to expose "any person" to liability.  See §§ 22-46-3, 22-46-13.  The South Dakota statute does, however, limit liability to persons who have been "entrusted with the property" of an elder or disabled adult.  See SDCL § 22-46-3.  This echos the trust component of the Arizona statute.  Like the Haldiman court, this court is extremely skeptical that an insurance company who voluntarily assumes the duty to provide workers compensation benefits on behalf of an employer can be said to have been "entrusted" with the property of a third-party beneficiary—i.e. the employee.  Still, references to almost-similar statutes from other states is not satisfactory or determinative.

When faced with a question of state law of first impression in a diversity case, the federal court must try to predict how the state supreme court would

43

rule if faced with the same issue.  Blankenship v. USA Truck, Inc., 601 F.3d 852, 856 (8th Cir. 2010).  Here, there are opinions of the South Dakota Supreme Court that point the way.

### c.    Controlling South Dakota Law Not Discussed by Parties

Two branches of law guide this court's decision.  The first addresses under what circumstances civil liability will arise for violation of a criminal statute.  In Christensen v. Quinn, 45 F. Supp. 3d 1043, 1091-92 (D.S.D. 2014), the court addressed the civil ramification for violation of South Dakota's criminal Animal Enterprise Protection Act (hereinafter "AEPA").  The AEPA made it a crime to enter and remain in an animal facility under circumstances where the entrant had notice his or her entry was forbidden or received notice to depart but failed to do so.  Id. at 1092 (citing SDCL § 40-38-3).  In addition to criminal penalties, the AEPA also provided for treble civil damages plus costs and attorney's fees.  Id. (citing SDCL § 40-38-5).  The Quinn court held no civil action for damages under the AEPA could be brought unless and until the defendant had been charged criminally and convicted under the AEPA, even though the AEPA did not specify this as a condition precedent to bringing a civil suit.  Id.

The Quinn court relied heavily on a decision of the South Dakota Supreme Court, K & E Land & Cattle, Inc. v. Mayer, 330 N.W.2d 529 (S.D. 1983).  In K & E, the court interpreted SDCL §§ 22-34-1 and 22-34-2.  Section 22-34-1 made it a crime to intentionally destroy, injure or damage public property without the consent of the owner.  Id. at 531 n.1.  Section 22-34-2

provided that anyone who violated § 22-34-1 was liable for treble damages in a civil action.  Id.  The South Dakota Supreme Court held that there could be no liability under the civil damages section unless the perpetrator of the property damage had first been prosecuted and convicted under the criminal statute. Id. at 532.  The court held it could not find a violation of the criminal statute had taken place because the defendant had not been prosecuted and convicted under that statute with the full protections of the criminal burden of proof and criminal procedure that would apply in a criminal prosecution.  Id.

The Quinn and K & E decisions stand for an important precedent that has application to Mr. Wetch's count five.  When civil liability is premised on, and arises out of, violation of a criminal statute, there must first be a criminal prosecution and conviction before a civil action can be brought.  That is because, as Justice Henderson observed in K & E, how can one say that a civil defendant violated the criminal statute without such a prosecution?  The conclusion that a person has violated a criminal statute is the end product of a person being charged with a crime, being tried or pleading guilty, and the state shouldering its burden to prove the defendant's criminal conduct beyond a reasonable doubt.  It includes the right to counsel, the right to remain silent, the right to suppression unconstitutionally obtained evidence, and the right to confront and cross-examine one's accusers.

A civil court, such as this one, cannot make a determination that any of the defendants herein have committed the crime described in SDCL § 22-46-3, which is the basis for civil liability under SDCL § 22-46-13, unless an actual

45

criminal prosecution has taken place.  No such criminal prosecution has taken place prior to Mr. Wetch asserting his claim in this case.  Under existing South Dakota precedent, then, this court concludes the South Dakota Supreme Court would not recognize a claim under § 22-46-13 under these circumstances.  K & E Land & Cattle, Inc., 330 N.W.2d at 532.  See also Rohweder v. Aberdeen Production Credit Ass'n., 765 F.2d 109, 113 (8th Cir. 1985) (following K & E and holding an action for damages under SDCL § 22-34-2 could not be brought unless there was first a criminal prosecution under SDCL § 22-34-1).

The second branch of South Dakota law that guides this court's decision is law interpreting the phrase "any person" within a statute, as the court did in Nielson v. AT & T Corp., 597 N.W.2d 434 (S.D. 1999).  In that case the South Dakota Supreme Court construed South Dakota's equine activities act, which limited the liability of equine activity sponsors, equine professionals, doctors of veterinary medicine, or "any other person" for any injury or death resulting from the inherent risks of equine activities.  Id. at 438.  Plaintiffs sued AT & T when their daughter's horse stepped into an open cable trench dug by AT & T. Id. at 436-37.  The horse somersaulted, landing on the daughter and killing her.  Id.

AT & T claimed immunity under the equine activities act, arguing that it was "any other person."  Id. at 439.  The court applied the canon of statutory construction known as *ejusdem generis*, "where general words follow the enumeration of particular classes of things, the general words will be construed as applying only to things of the same general class as those enumerated."  Id.

46

The court held that "any other person," in the context of the larger equine activities act, meant any other person/defendant involved in equine activities.  Id.

Applying the analysis from Nielson to this case, it is clear the elder and disabled adult statutes are aimed at preventing misconduct—physical and financial--by persons who routinely care for adults who are vulnerable because of age or disability.  The statutes speak of "caretakers," and persons "entrusted with the property" of an elder or disabled adult.  There are mandatory and permissive reporting requirements if third parties observe abuse.  See SDCL §§ 22-46-5, 22-46-7, 22-46-9, 22-46-10, and 22-46-11.   It stretches the imagination to assume the South Dakota legislature meant to impose on physicians and other health care providers a mandatory duty to report to their local state's attorney if a workers compensation insurance company refused to pay for medical bills for one of their patients.  Mr. Wetch's interpretation of SDCL ch 22-46 would result in such an absurd application of the statute. Accordingly, the court interprets the phrase "any person" in SDCL § 22-46-3 to mean nursing homes, assisted living facilities, home health care, and similar types of individuals and organizations dedicated to taking care of elders and disabled adults as their occupation or familial or court-imposed obligation.

Based on the foregoing, this magistrate judge respectfully recommends granting all the defendants' motions to dismiss count five of Mr. Wetch's amended complaint as failing to state a claim on which relief can be granted.

### 3.    Lumping All Defendants Together

All the defendants fault Mr. Wetch for his so-called "shotgun" pleading in his complaint in which all the defendants' actions are lumped together. All defendants except US Fire seek dismissal of all Mr. Wetch's claims againt them on the basis that Mr. Wetch fails to specifically set forth what actions each defendant took.

The court notes Mr. Wetch filed his amended complaint July 3, 2018. See Docket No. 44. Defendants filed their motions to dismiss on July 17, 2018. Given the "shell game" nature of all the competing evidence discussed above in the personal jurisdiction portion of this opinion, the court concludes it is too early to require Mr. Wetch to penetrate defendants' mystifying edifice of trade names, trade marks, and shell companies and determine what role exactly each of the remaining defendants played in the various claims asserted by Mr. Wetch. The court accordingly recommends denying defendants' remaining motions to dismiss under Rule 12(b)(6). After a full and fair opportunity for discovery has been accorded to Mr. Wetch, one or more of the defendants can make a motion for summary judgment on the grounds that they were not personally involved. The court notes all the defendants are represented by the same counsel, so denial of the Rule 12(b)(6) motion in favor of allowing discovery does not impose as much of a burden as would be imposed if each were represented by separate counsel.

## CONCLUSION

Based on the foregoing facts, law and analysis, this court respectfully recommends:

1.    the motion to dismiss by defendant Crum & Forster Holdings Corp. [Docket No. 45] be granted in part and denied in part.  The court recommends Crum & Forster Holdings Corp.'s motion to dismiss for lack of personal jurisdiction over this defendant be **GRANTED**.  The remaining arguments for dismissal on the basis of Rule 12(b)(6) (failure to state a claim) made by Crum & Forster Holdings Corp. should be **DENIED** as moot.

2.    the motion to dismiss by defendant Crum & Forster Commercial Insurance and North River Insurance Company [Docket No. 46] should be granted in part and denied in part as follows:

   a.    motion to dismiss by both defendants for lack of personal jurisdiction should be **DENIED**.

   b.    motion to dismiss count five of Mr. Wetch's complaint should be **GRANTED**.

   c.    motion to dismiss remaining counts against these two defendants should be **DENIED.**

3.    the motion to dismiss pursuant to Rule 12(b)(6) by United States Fire Insurance Co. [Docket No. 47] should be **GRANTED** as to count five of Mr. Wetch's complaint and **DENIED** as to all other counts.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED December 6, 2018.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge

50